# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**JEAN CHRISTEL**
        **Plaintiff,**

     v.                                                          **Case No. 09-C-36**

**MICHAEL J. ASTRUE,**
**Commissioner of the Social Security Administration**
        **Defendant.**

## DECISION AND ORDER

Plaintiff Jean Christel applied for social security disability benefits, claiming inability to work due to heart problems, tendinitis and carpal tunnel syndrome. (Tr. at 128; 132; 150.) The Social Security Administration ("SSA") denied the application initially (Tr. at 69; 70; 75; 79) and on reconsideration (Tr. at 71; 72; 84; 88). Plaintiff requested a hearing before an Administrative Law Judge ("ALJ") (Tr. at 92), but the ALJ also concluded that plaintiff was not disabled (Tr. at 16-20). The SSA's Appeals Council then denied plaintiff's request for review (Tr. at 1), making the ALJ's decision the agency's final ruling on the application. See Liskowitz v. Astrue, 559 F.3d 736, 739 (7th Cir. 2009). Plaintiff now seeks judicial review of the decision pursuant to 42 U.S.C. § 405(g).

## I.  APPLICABLE LEGAL STANDARDS

**A.  Judicial Review**

Under § 405(g), the court reviews an ALJ's decision to determine whether it is supported by "substantial evidence" and consistent with applicable law. See, e.g., Nelms v. Astrue, 553 F.3d 1093, 1097 (7th Cir. 2009); Dixon v. Massanari, 270 F.3d 1171, 1176 (7th Cir. 2001).

Substantial evidence is such relevant evidence as a reasonable person could accept as adequate to support the decision. Ketelboeter v. Astrue, 550 F.3d 620, 624 (7th Cir. 2008). Accordingly, if the record contains conflicting evidence that would allow reasonable people to differ as to whether the claimant is disabled, the responsibility for that decision rests with the ALJ. Binion v. Chater, 108 F.3d 780, 782 (7th Cir.1997). The court does not re-weigh the evidence, resolve evidentiary conflicts, decide questions of credibility, or substitute its judgment for the ALJ's. Powers v. Apfel, 207 F.3d 431, 434 (7th Cir. 2000).

Nevertheless, the court must consider the entire record in reviewing an ALJ's decision, including both the evidence that supports, as well as the evidence that detracts from, that decision. Briscoe v. Barnhart, 425 F.3d 345, 351 (7th Cir. 2005). A decision that fails to provide an accurate and logical bridge between the evidence and the result, Sarchet v. Chater, 78 F.3d 305, 307 (7th Cir.1996), lacks a meaningful discussion of the evidence, Briscoe, 425 F.3d at 351, or rests upon flawed logic or serious errors in reasoning, Indoranto v. Barnhart, 374 F.3d 470, 475 (7th Cir. 2004), is subject to reversal, even though there may be enough evidence in the record to support it. Similarly, if the ALJ commits an error of law, reversal is "required without regard to the volume of evidence in support of the factual findings." Binion, 108 F.3d at 782. The ALJ commits such an error if she violates the SSA's regulations and rulings for evaluating disability claims. See, e.g., Golembiewski v. Barnhart, 382 F.3d 721, 724 (7th Cir. 2004); Prince v. Sullivan, 933 F.2d 598, 602 (7th Cir. 1991).

**B.    Disability Standard**

The SSA determines disability pursuant to a sequential, five-step test, pursuant to which the ALJ asks:

(1) Has the claimant engaged in substantial gainful activity ("SGA") since her alleged

2

onset of disability?

(2) If not, does she suffer from a severe, medically determinable impairment?

(3) If so, does that impairment meet or equal any impairment contained in the SSA's Listings of presumptively disabling impairments?

(4) If not, does she retain the residual functional capacity ("RFC") to perform her past relevant work?

(5) If not, can she perform other jobs existing in significant numbers?

See, e.g., Villano v. Astrue, 556 F.3d 558, 561 (7th Cir. 2009); see also Patterson v. Barnhart, 428 F. Supp. 2d 869, 872 (E.D. Wis. 2006) (citing Zurawski v. Halter, 245 F.3d 881, 886 (7th Cir. 2001)) (discussing application of the five-step test).

The claimant bears the burden of presenting evidence at steps one through four, but if she reaches step five the burden shifts to the Commissioner to show that the claimant can make the adjustment to other work. See, e.g., Briscoe, 425 F.3d at 352. The Commissioner may carry this burden by either relying on the Medical-Vocational Guidelines, commonly known as "the Grid," a chart that classifies a person as disabled or not disabled based on her age, education, work experience and exertional ability, or by summoning a vocational expert ("VE") to offer an opinion on other jobs the claimant can do despite her limitations. See, e.g., Herron v. Shalala, 19 F.3d 329, 336-37 (7th Cir. 1994). The Grid considers only exertional (i.e., strength) limitations, so unless the claimant is deemed disabled thereunder based on strength limitations alone, the ALJ may not rely solely on the Grid and must consult a VE if the claimant has significant non-exertional limitations, such as pain, or mental, sensory or postural limitations. See Luna v. Shalala, 22 F.3d 687, 691 (7th Cir. 1994); Herron, 19 F.3d at 336-37.

## II. FACTS AND BACKGROUND

### A. Plaintiff's Treatment Records and Testimony

Fifty years old and with a high school level education, plaintiff reported a past employment history as a fast food worker and motel housekeeper. (Tr. at 31-32.) She last worked at Hardee's restaurant in September 2005, and alleged an onset of disability in October 2005 following a heart attack. (Tr. at 25; 32.) The medical records indicate that plaintiff underwent stent placements in 2004 and 2005, and, following her heart attack and testing which an revealed an "ejection fraction" of 30%,[1] implantation of a defibrillator device in December 2005. (Tr. at 244; 248-52; 315; 335.) During subsequent follow-up visits in 2006, she generally reported doing well, but with some shortness of breath on exertion. She also expressed concerns about her inability to afford needed medications due to a lack of insurance and financial means. (Tr. at 221; 225; 227.)

In 2007, following plaintiff's complaints of left hand pain, swelling and weakness, plaintiff's cardiologist, Dr. Coulis, diagnosed tendinitis and carpal tunnel syndrome, suggesting that she take ibuprofen and wear a splint. Dr. Coulis found plaintiff stable from a cardiovascular standpoint, noting that she exercised regularly, although she did report some intermittent chest pain. (Tr. at 228-29; 237; 239; 297; 325-26.) Nevertheless, in a July 24, 2007 report, Dr. Coulis indicated that plaintiff had been unable to work since October 27, 2004,

---

[1]Ejection fraction refers to the percentage of blood within the heart chamber pumped out with every heartbeat, normally 55% or greater. See Stedman's Medical Dictionary 710-11 (27th ed. 2000); Jackson v. Prudential Ins. Co. of America, 530 F.3d 696, 698 n.3 (8th Cir. 2008). An ejection fraction of 30% or less, when accompanied by other symptoms (not present in this case), qualifies as a presumptive disability under the Listings. See 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 4.02; see also Prange v. Astrue, 547 F. Supp. 2d 926, 943 (S.D. Ind. 2008) (discussing this Listing).

4

due to her cardiac issues. (Tr. at 317.)

In February 2008, Dr. Coulis noted that plaintiff had no discharges from her defibrillator, and that her chief complaints were numbness and tingling in her hands and inability to hold objects early in the morning. She had tried splints, with no resolution of her symptoms. He otherwise continued her medications. (Tr. at 328-29.) The following month plaintiff had a new defibrillator lead installed after the previous device malfunctioned. (Tr. at 334-35.) On May 16, 2008, Dr. Coulis prepared a report regarding plaintiff's functional limitations, stating:

> This patient continues to suffer from ischemic cardiomyopathy with a reduced ejection fraction, LVEF 30%. She has had a prior MI and has had cardiac stent placement in 2004 and 2005. She has also been treated for ventricular tachycardia.
>
> This patient's cardiac condition is currently stable. However, she does have a significant loss of cardiac function. My treatment records have indicated complaints of shortness of breath with exertion. I do believe that she could not return to her prior work as a fast food worker or housekeeper on a full-time basis. She does not have sufficient cardiac reserve to sustain that type of work on a full-time basis. If she were to work full-time, it would have to be at the sedentary level because of her limited cardiac reserve.

(Tr. at 315.)

At the hearing, plaintiff testified that she could not work full-time due to fatigue. (Tr. at 39.) She stated that she experienced shortness of breath when walking up stairs (Tr. at 44), and that after walking the four blocks to her daughter's house she had to stop and catch her breath (Tr. at 45). She indicated that in the last few months of her employment at Hardee's she experienced shortness of breath, nausea and vomiting. (Tr. at 41.)

Plaintiff testified that on a typical day she awoke at 5:00 a.m., walked to her daughter's house and prepared her five-year-old grandson for school. After the boy departed at 7:30 a.m., she returned home, took her medications, did a bit of housecleaning, then relaxed on the

5

couch. (Tr. at 33; 34; 36.) At about 2:00 p.m., she returned to her daughter's home and watched her grandson until about 7:00 p.m. She then returned home and relaxed. (Tr. at 33-34.) She indicated that she watched her grandson for a total of six hours per day, Monday through Friday, during the school year. (Tr. at 34.) During the summer, she minded him from 6:30 a.m. to 3:00 p.m. (Tr. at 34-35.) She testified that she did not lift her grandson, and that she spent most of her time with him sitting on the couch playing games or watching TV. (Tr. at 47.)

Plaintiff testified that she was able to care for her personal needs, cook, wash dishes, do laundry and clean the house. (Tr. at 36.) However, she indicated that she required a break, resting on the couch with her feet up, after about twenty minutes of housework. (Tr. at 46-47.) She testified that she was able to walk to her sister's house about one mile away. She smoked a pack of cigarettes every three to four days. (Tr. at 37.)

Plaintiff also indicated that she broke her wrist in 2004 and thereafter developed tendinitis and carpal tunnel syndrome. (Tr. at 40; 42.) She testified that she had no medical insurance since 2006; while Dr. Coulis saw her free of charge, she could not afford to see a specialist about her wrist and hands. Dr. Coulis recommended that she wear a splint. She indicated that her hand problems interfered with her ability to prepare sandwiches when she worked at Hardee's. (Tr. at 42-43.)

**B.    SSA Consultants**

On March 30, 2007, a state agency consultant completed a physical RFC report for the SSA, finding plaintiff capable of light work, with no further limitations. (Tr. at 282-89.) On August 30, 2007, another consultant affirmed the evaluation. (Tr. at 304.) The SSA also arranged for plaintiff to be evaluated by Dr. Denis Pleviak on August 21, 2007. Dr. Pleviak

6

recorded plaintiff's medical history and conducted a physical exam, noting some limitation of left wrist motion but firm grip strength with both hands. He offered no opinion on plaintiff's ability to work. (Tr. at 299-302.)

**C.    VE's Testimony**

The VE, Beth Hoynik, identified plaintiff's past work as a motel maid as light, unskilled work; as a fast food worker as light and unskilled; and as a fast food supervisor as light, semi-skilled to skilled. (Tr. at 51.) None of these jobs produced transferrable skills. (Tr. at 51.) The ALJ asked a series of hypothetical questions, assuming a person fifty years old with a high school education and work history like plaintiff's. (Tr. at 51-52.) If the person was limited to light work, with occasional postural movements and frequent (not constant) use of the hands, the person could not perform plaintiff's previous fast food work but could perform the housekeeping job. If the person was limited to sedentary work, none of plaintiff's prior jobs could be performed. (Tr. at 52.)[2]

**D.    ALJ's Decision**

The ALJ determined that plaintiff had not worked since her alleged onset date and that she was "severely impaired," but that her impaired condition did not meet or equal a Listing.[3] The ALJ then determined that plaintiff retained the RFC for a wide range of unskilled, light work with no more than frequent (not constant) use of the hands and no more than occasional

---

[2]The VE went on to opine that a hypothetical person limited to sedentary work could perform other jobs such as hand packaging, assembly work and production work. (Tr. at 53.) If the person could use her hands only occasionally, these jobs could not be done, but a security monitor job could. (Tr. at 54.) Because the ALJ ultimately denied the claim at step four, she did not rely on this testimony.

[3]The ALJ did not specify plaintiff's severe impairment(s).

7

postural changes (i.e., bending, stooping and crouching). In so finding, she rejected as unsupported by the record Dr. Coulis's opinion that plaintiff was limited to sedentary work. Based on this RFC and relying on the VE's testimony, the ALJ concluded that plaintiff could perform her past work as a motel maid. The ALJ therefore found plaintiff not disabled and denied the application. (Tr. at 17-19.)

### III. DISCUSSION

Plaintiff argues that the ALJ erred in rejecting the opinion of her treating cardiologist, Dr. Coulis, which limited her to sedentary work, and in finding that her past work as a motel maid constituted SGA for purposes of step four. I address each argument in turn.

### A.  Treating Source Report

Medical opinions from a social security claimant's treating physician are entitled to special consideration; if such an opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence in the case record, the ALJ must give it "controlling weight." SSR 96-8p; Clifford v. Apfel, 227 F.3d 863, 870 (7th Cir. 2000). Even if the ALJ finds that a treating source opinion does not meet the standard for controlling weight, she may not simply reject it. SSR 96-2p. Rather, she must determine the weight to give the opinion by considering various factors, including the length, nature and extent of the claimant and physician's treatment relationship; the degree to which the opinion is supported by the evidence; the opinion's consistency with the record as a whole; and whether the doctor is a specialist. 20 C.F.R. § 404.1527(d). "In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." SSR 96-2p. Regardless of the weight the

8

ALJ elects to give the treating source opinion, she must always "give good reasons" for her decision. 20 C.F.R. § 404.1527(d)(2). Finally, the "ALJ must not substitute [her] own judgment for a physician's opinion without relying on other medical evidence or authority in the record." Clifford, 227 F.3d at 870; see also Rohan v. Chater, 98 F.3d 966, 970 (7th Cir. 1996); Schmidt v. Sullivan, 914 F.2d 117, 118 (7th Cir. 1990).

In the present case, the ALJ acknowledged that Dr. Coulis limited plaintiff to sedentary work, but found that "the balance of the record does not support that assessment." (Tr. at 17.) The ALJ stated (1) that plaintiff's cardiac condition had been stable, and she reported doing well and being asymptomatic since implantation of the defibrillator; (2) that plaintiff had little follow-up treatment and had been maintained on appropriate cardiac medications, without strong pain medication; (3) that the defibrillator had consistently been found to be functioning normally; and (4) that certain records indicated that plaintiff did a substantial amount of walking and otherwise had an "active lifestyle." (Tr. at 17.) These reasons do not withstand scrutiny.

First, Dr. Coulis acknowledged that plaintiff's condition was "stable," but that she nevertheless had "a significant loss of cardiac function." (Tr. at 315.) Accordingly, the issue the ALJ had to decide was not whether plaintiff's condition was getting worse, but whether that condition limited her sedentary work. See Lechner v. Barnhart, 321 F. Supp. 2d 1015, 1030 (E.D. Wis. 2004) ("One can be stable and yet disabled."). Dr. Coulis further noted – and the record reflects – that plaintiff continued to experience shortness of breath with exertion after installation of the defibrillator (Tr. at 227; 315), contrary to the ALJ's statement. Finally, Dr. Coulis's opinion that plaintiff suffered a significant loss of cardiac function was supported by the objective medical testing demonstrating an ejection fraction of 30%, a finding the ALJ failed to even mention.

9

Second, the ALJ relied on plaintiff's limited treatment without considering any explanations for such. See SSR 96-7p ("The adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment."); see also SSR 82-59 (explaining that inability to afford treatment provides justifiable cause for failure to obtain treatment that would restore ability to work). The record indicates that plaintiff lacked medical insurance or the financial means to otherwise obtain full medical treatment (E.g., Tr. at 42-43; 225; 320),[4] and courts "have regularly held that inability to afford treatment constitutes a good reason for not seeking it." Neave v. Astrue, 507 F. Supp. 2d 948, 964 (E.D. Wis. 2007) (collecting cases); see also Craft v. Astrue, 539 F.3d 668, 679 (7th Cir. 2008).

Further, the ALJ failed to explain what sort of further treatment would be expected for a person with a disabling heart condition. See Brown v. Barnhart, 298 F. Supp. 2d 773, 797 (E.D. Wis. 2004) (reversing where "the ALJ failed to cite any medical evidence concerning what sort of treatment plaintiff should have been pursuing"); Dominguese v. Massanari, 172 F. Supp. 2d 1087, 1096 (E.D. Wis. 2001) (stating that, in the absence of medical evidence concerning how regularly a patient with the plaintiff's condition would be expected to see a doctor, the ALJ should not have made his own independent medical determination about the frequency of doctor visits). The ALJ's reference to "strong pain medication" seems a shot in the dark; it is unclear why a person with a heart condition, who does not complain of disabling pain, would

---

[4] Dr. Coulis saw her free of charge, but she lacked the means for follow-up treatment regarding her carpal tunnel. (Tr. at 42-43.)

10

need such medications. Cf. Sarchet, 78 F.3d at 307 ("Since swelling of the joints is not a symptom of fibromyalgia, its absence is no more indicative that the patient's fibromyalgia is not disabling than the absence of headache is an indication that a patient's prostate cancer is not advanced.").[5]

Third, the ALJ's statement that plaintiff's defibrillator consistently functioned properly is – aside from having no apparent connection to the persuasiveness of Dr. Coulis's report – contrary to the record. In March 2008, after plaintiff's "ICD lead was noted to be malfunctioning," she "underwent an ICD lead revision with implantation of a new ICD lead." (Tr. at 334.)

Fourth, although one of Dr. Coulis's notes indicates, in the "social history" section, that plaintiff "had an active lifestyle" (Tr. at 321), neither the note nor the ALJ explained what this meant or how it was inconsistent with a sedentary restriction. The treatment notes also indicate that plaintiff "exercises on a regular basis" (Tr. at 326; 329), but again it is unclear how strenuous this exercise was or how it was inconsistent with Dr. Coulis's report. Plaintiff testified and wrote on her physical activities questionnaire that she walked for exercise, as her doctor recommended. (Tr. at 36; 179.) Neither statement necessarily suggests that plaintiff can sustain full-time light work, which would require her to remain on her feet for about six hours in an eight hour work day, see SSR 83-10 ("[T]he full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday"), for forty hours

---

[5] Perhaps the ALJ meant that plaintiff took no pain medications for her carpal tunnel and tendinitis. But absent some explanation in the decision, I cannot assume that. See Steele v. Barnhart, 290 F.3d 936, 942 (7th Cir. 2002) (explaining that "principles of administrative law require the ALJ to rationally articulate the grounds for her decision and confine [judicial] review to the reasons supplied by the ALJ").

11

per week or an equivalent work schedule, see SSR 96-8p ("Ordinarily, RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule.").[6]

Finally, the ALJ cited no contrary medical evidence in rejecting Dr. Coulis's report and setting a light RFC. The Commissioner notes that the state agency consultants found plaintiff capable of light work (but without the manipulative and postural limitations the ALJ adopted). However, the ALJ did not even mention, much less rely upon, these opinions.[7] See Steele, 290

---

[6]Earlier in the decision, the ALJ commented on plaintiff's daily activities, which included managing personal and child care, doing household chores, walking up to one mile to go visiting, and reading and watching television. (Tr. at 16-17.) The Seventh Circuit has repeatedly cautioned ALJs about relying on daily activities in assessing ability to work full-time outside the home. See, e.g., Moss v. Astrue, 555 F.3d 556, 562 (7th Cir. 2009) (citing Craft, 539 F.3d at 680; Mendez v. Barnhart, 439 F.3d 360, 362 (7th Cir. 2006)). There is a "difference between a person's being able to engage in sporadic physical activities and her being able to work eight hours a day five consecutive days of the week." Carradine v. Barnhart, 360 F.3d 751, 755 (7th Cir. 2004). In any event, none of the activities listed by the ALJ is inconsistent with plaintiff's claim of limitation to sedentary work. Plaintiff explained that she spent most of the time with her grandson sitting on the couch (Tr. at 47), see Gentle v. Barnhart, 430 F.3d 865, 867-68 (7th Cir. 2005) (explaining that the ability to care for oneself and small children in the home is not inconsistent with the inability to work full-time outside the home); that her performance of household tasks was punctuated with rest breaks (Tr. at 46-47), see Clifford, 227 F.3d at 872 (finding that the ability to perform limited household tasks, with rest breaks, did not undermine a claim of disability); and that she had to stop and catch her breath after walking four blocks (Tr. at 45), see id. (finding that the plaintiff's ability to walk, which was recommended by her doctor as exercise, did not undermine a claim of disability where the plaintiff had to "rest after walking anywhere between three and five blocks"). Finally, as I've noted in other cases, it is hard to see how the ability to sit and read or watch TV undermines a disability claim. See Beth v. Astrue, 494 F. Supp. 2d 979, 1005 n.20 (E.D. Wis. 2007) (citing Mason v. Barnhart, 325 F. Supp. 2d 885, 903-05 (E.D. Wis. 2004)).

[7]Later in her decision, the ALJ mentioned Dr. Pleviak's consultative examination report (Tr. at 18), but as noted earlier, Dr. Pleviak rendered no opinion on plaintiff's ability to work. In discussing that report, the ALJ noted that plaintiff at times looked for work but was not hired. The ALJ noted, correctly, that the inability to find a job or get hired was not determinative of disability. The Commissioner finds it significant that plaintiff looked for work at fast food

12

F.3d at 942 (holding that principles of administrative law require the ALJ to rationally articulate the grounds for her decision, and that the ALJ (not the Commissioner's lawyers) must build an accurate and logical bridge from the evidence to her conclusion).

Because the ALJ failed to provide a reasoned basis for rejecting Dr. Coulis's report, the decision must be reversed and the matter remanded for reconsideration.[8]

**B.     Past Work**

A job may be considered "past relevant work" for purposes of the step four analysis when it (1) constituted "substantial gainful activity" ("SGA"), (2) lasted long enough for the claimant to learn to do the job ("duration"), and (3) was done within the past fifteen years ("recency"). See Neave, 507 F. Supp. 2d at 961; SSR 82-62; 20 C.F.R. § 404.1565(a). Under the regulations, "substantial" work activity "is work activity that involves doing significant physical or mental activities." Work may be substantial even if it is done on a part-time basis. 20 C.F.R. § 416.972(a). "Gainful" work activity "is work activity [done] for pay or profit. Work

---

restaurants, work Dr. Coulis said she could not do. However, the Seventh Circuit has acknowledged that a "person can be totally disabled for purposes of entitlement to social security benefits even if, because of an indulgent employer or circumstances of desperation, he is in fact working." Gentle v. Barnhart, 430 F.3d 865, 867 (7th Cir. 2005). Further, plaintiff was never hired by any employer after her alleged onset date, so, as in Gentle, there is no step one impediment to her claim.

[8]The Commissioner argues that Dr. Coulis set forth a contrary opinion in July 2007, indicating that plaintiff had been disabled as of 2004; the Commissioner argues that this shows that Dr. Coulis was either trying to help plaintiff or had a poor understanding of what disability is. However, as the Commissioner concedes, the ALJ did not make this argument, and my review is limited to the reasons she gave. The Commissioner also argues that Dr. Coulis lacked the background necessary to determine whether plaintiff could return to her past work. Again, the ALJ did not provide this as a basis for rejecting Dr. Coulis's report, making the Commissioner's argument impermissibly post-hoc. See, e.g., Golembiewski, 322 F.3d at 916 ("[G]eneral principles of administrative law preclude the Commissioner's lawyers from advancing grounds in support of the agency's decision that were not given by the ALJ.").

13

activity is gainful if it is the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. § 416.972(b). The regulations set forth certain monthly earning levels that give rise to a presumption that a job constitutes SGA. See 20 C.F.R. § 404.1574.

The ALJ found that plaintiff could return to her past work as a motel maid. However, the ALJ made no finding that this job constituted SGA or that plaintiff performed it for a sufficient duration, and the record contains very little evidence regarding the job. In her work history report, plaintiff indicated that, in addition to her work at Hardee's from 1994 to 2005, she worked as a maid at Fountain Park Motel. She listed no dates regarding the maid job. (Tr. at 159.) During her testimony, plaintiff stated that she worked part-time as a motel maid at the same time she held the job at Hardee's, working about five days per week when called in. (Tr. at 54-56.) However, she was unable to provide clear dates on when she performed this job. (See Tr. at 50.) Nor did she explain how many hours per week she typically worked, or how much she earned. The computerized earnings statement contained in the administrative record is likewise unhelpful. It indicates that plaintiff earned $1143.35 in 1999 working for "Select Inn of Sheboygan, Inc." (Tr. at 143.) Assuming that this refers to the motel maid job, depending on the number of months she worked at this job in 1999 the work may not have been SGA. See 20 C.F.R. § 404.1574(b)(2) (indicating that from January 1990 to June 1999, earnings of over $500 per month were presumed substantial; from July 1999 to December 2000, earnings over $700 per month were presumed substantial); see also Jones v. Shalala, 21 F.3d 191, 192 (7th Cir. 1994) (discussing gainful work under this regulation).

Given the lack of explanation by the ALJ and the uncertainty in the record, the matter

14

must be remanded for reconsideration of this issue.[9]

## IV. CONCLUSION

Plaintiff argues for a judicial award of benefits as of her fiftieth birthday. Under the Grid, a person with her other characteristics limited to sedentary work is deemed disabled as of that age. However, the court may direct an award of benefits only if all factual issues have been resolved and the record clearly supports a finding of disability. See, e.g., Foster v. Astrue, 548 F. Supp. 2d 667, 672 (E.D. Wis. 2008) (citing Briscoe, 425 F.3d at 356; Campbell v. Shalala, 988 F.2d 741, 744 (7th Cir. 1993); Neave, 507 F. Supp. 2d at 966-67). Because unresolved factual issues remain, the matter must remanded for further evaluation by an ALJ.

**THEREFORE, IT IS ORDERED** that the ALJ's decision is **REVERSED**, and the matter is remanded for further proceedings consistent with this decision. The Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 24th day of July, 2009.

/s Lynn Adelman
_____
LYNN ADELMAN
District Judge

---

[9] As the Commissioner notes, part-time work may constitute SGA. However, plaintiff does not base her argument on the fact that the maid job was part-time; rather, she bases it on the lack of evidence that she earned a sufficient amount for the work to constitute SGA.

15